**In the Matter of the WELFARE OF J.H., Child.**

**No. A12–1405.**

Supreme Court of Minnesota.

March 19, 2014.

Cathryn Middlebrook, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Saint Paul, MN, for respondent.

Lori Swanson, Attorney General and John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant Ramsey County Attorney, Saint Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

The issue in this case is what express findings a juvenile court is required to make, pursuant to Minn.Stat. § 260B.125, subds. 3–4 (2012), when determining whether a child has overcome by clear and convincing evidence the presumption in favor of certification to adult court. Respondent J.H. was charged by juvenile petition, as both a principal and an accomplice, with criminal sexual conduct, conspiracy to commit first-degree criminal sexual conduct, kidnapping, and committing a crime for the benefit of a gang arising out of the rape of a 14–year–old girl. Following a 3–day hearing, the juvenile court concluded that J.H. had not overcome the presumption in favor of certification and certified J.H. for prosecution as an adult. A divided court of appeals reversed, concluding, among other things, that the juvenile court was required under Minn.Stat. § 260B.125, subd. 4, to expressly weigh the seriousness of the alleged offense and the child's prior record of delinquency separate from the other public safety factors and to specifically delineate how its determination of these two factors impacted its certification decision. Because we conclude that the court of appeals erroneously interpreted Minn.Stat. § 260B.125, subd. 4, and that the juvenile court did not abuse its discretion by concluding that J.H. failed to over-

come by clear and convincing evidence the presumption in favor of certification, we reverse.

On November 23, 2011, the victim (G.K.), who was 14 years old at the time, told a sexual assault nurse at Children's Hospital that she had been raped by gang members. G.K. told police investigators that she and a friend, A.Y., rode in a car driven by Mang Yang to a party in St. Paul, and then to a second party at an abandoned house in St. Paul. G.K. recognized six of the individuals at the second party as True Blood 22 (TB22)[1] gang members. When G.K. decided to leave the party, she and A.Y. went to Yang's car. Two gang members, however, followed them and forcibly removed G.K. from the car and carried her into a bedroom in the house. G.K. was screaming and resisted going into the bedroom. G.K. was pushed down onto a mattress, her clothing was removed, and then she was held down by several of the gang members and raped by another gang member. Someone in the room yelled "police," and everybody ran out of the bedroom and the house. G.K. told police that there were between six and eight individuals in the bedroom, including J.H., during the rape.

Police interviewed several individuals, including A.Y., Yang, J.H.'s brother (Johnny H.), and J.H. A.Y. told police that several of the men at the abandoned house, including J.H., were "Blood" gang members, and that they were trying to separate her from G.K. When G.K. went to Yang's car to leave, two gang members pulled her out of the car to take her back into the house. A.Y. had walked down the street looking for street signs so she could give directions to someone to pick her and G.K. up, and when she returned, G.K. was gone.

A.Y. walked back into the house and found G.K. coming out of the bedroom crying and pulling up her pants.

Yang told police the men at the party were gang members, that they were trying to get the girls drunk and then rape them, and that they had done this once before. He stated that G.K. was forcibly removed from the car and brought back into the abandoned house. When Yang and A.Y. walked back into the house and opened the bedroom door, the gang members, including J.H. and Johnny H., ran out of the bedroom. Yang saw G.K. lying on the floor with her legs spread apart and pulling up her underwear.

Johnny H. told police that the men at the party were TB22 gang members and that all of them except J.H. wanted to have sex with G.K. During the rape, Johnny H. and two other gang members held G.K.'s arms and leg to prevent her from getting away, and he witnessed Vang Vue penetrate her vagina. Johnny H. admitted that J.H. was in the room at the time of the rape. Subsequently, Johnny H. testified at his guilty plea hearing that J.H. participated in the plan to rape G.K., and that J.H. intended to rape G.K. Also, Johnny H. testified that the gang's method of operation when they party with girls is to get the girls drunk and then rape them.

J.H. admitted to police that he was a TB22 gang member and showed police his gang tattoo. J.H. stated that he was in the room when the rape occurred, that he heard someone "slam" G.K. onto the mattress, that two "big dudes" held G.K. down, and that at least two men raped G.K. J.H. admitted that the rape stopped because someone said the police were coming.

---

1. According to the juvenile petition, the TB22 gang is a documented criminal street gang that has been involved in crimes of violence including rapes, assaults, drive-by shootings, possession of stolen guns, auto thefts, burglaries, and drug-related crimes.

The State filed a juvenile petition alleging J.H. was delinquent based on first-degree criminal sexual conduct, in violation of Minn.Stat. § 609.342, subd. 1(f)(i) (2012); conspiracy to commit first-degree criminal sexual conduct, in violation of Minn.Stat. §§ 609.175, subd. 2(3) (2012), 609.342 subd. 1(f)(i); kidnapping, in violation of Minn.Stat. § 609.25, subd. 1(2) (2012); and committing a crime for the benefit of a gang, in violation of Minn.Stat. § 609.229, subd. 2 (2012). J.H. was charged as both a principal and as an accomplice. *See* Minn.Stat. § 609.05 (2012).

At J.H.'s certification hearing, the State presented evidence consistent with the police investigation. The juvenile court heard testimony from 12 people, including Kao Dua Chi Moua, a juvenile probation officer, and Dr. Gary Hertog, a clinical psychologist. Moua recommended J.H. be designated for extended jurisdiction juvenile (EJJ) prosecution on the basis that only the seriousness of the offense and J.H.'s culpability favored certification. Dr. Hertog also recommended that J.H. be designated for EJJ prosecution, concluding that only the seriousness of the offense clearly supported certification and therefore the presumption of certification "could be viewed as overcome."

Following the certification hearing, the juvenile court issued findings of fact, conclusions of law, and an order certifying J.H. to stand trial as an adult in district court. The court concluded that J.H. had not demonstrated by clear and convincing evidence that retaining the proceeding in the juvenile court would serve public safety. The court determined that five of the six public safety factors favored certification, with only J.H.'s lack of a prior record of delinquency favoring EJJ designation. In doing so, the court rejected Moua's and Dr. Hertog's opinions that public safety would be served by designating J.H. for EJJ prosecution because, among other reasons, they were unable to testify that even with the available programming it was likely that J.H. would not pose a threat to public safety.

A divided court of appeals reversed. *In re Welfare of J.H.*, 829 N.W.2d 607 (Minn. App.2013). The majority concluded, in part, that the juvenile court abused its discretion by failing to expressly weigh the seriousness of the alleged offense and J.H.'s prior record of delinquency separately from the other public safety factors and by failing to specifically delineate how its determination of these two factors impacted its certification decision. *Id.* at 618. We granted review.

I.

The State argues that the juvenile court did not abuse its discretion by concluding that J.H. failed to present sufficient evidence to overcome the presumption in favor of certification to adult court. Further, the State argues that the court of appeals erred by concluding that the juvenile court is required to "expressly weigh" the seriousness of the child's alleged offense and the child's prior record of delinquency separately from the other public safety factors listed in Minn.Stat. § 260B.125, subd. 4, and "specifically delineate" how its determination of these two factors impacted the juvenile court's certification decision. J.H. counters that the juvenile court's findings on most of the public safety factors are clearly erroneous or poorly reasoned.

We review the juvenile court's decision to certify a child to adult court for an abuse of discretion. *In re Welfare of D.F.B.*, 433 N.W.2d 79, 82 (Minn.1988). Specifically, we review questions of law de novo, *see In re Welfare of R.J.E.*, 642 N.W.2d 708, 710–11 (Minn.2002), and we

review findings of fact under the clearly erroneous standard, *State v. Buckingham,* 772 N.W.2d 64, 69 (Minn.2009); *see also* Minn. R. Civ. P. 52.01. We will not disturb a finding about whether public safety would be served by retaining the proceeding in juvenile court unless it is clearly erroneous. *See In re Welfare of N.J.S.,* 753 N.W.2d 704, 710 (Minn.2008). In determining whether the juvenile court's findings are clearly erroneous, we view the record in the light most favorable to the juvenile court's findings. *See In re Custody of N.A.K.,* 649 N.W.2d 166, 174 (Minn. 2002). A finding is clearly erroneous only if "there is no reasonable evidence to support the finding or when an appellate court is left with the definite and firm conviction that a mistake occurred." *State v. Rhoads,* 813 N.W.2d 880, 885 (Minn.2012).

■■■ Statutory interpretation is a question of law that we review de novo. *In re Welfare of J.J.P.,* 831 N.W.2d 260, 264 (Minn.2013). "The goal of all statutory interpretation is to ascertain and effectuate the intent of the Legislature." *Id.* (citing Minn.Stat. § 645.16 (2012)). We interpret the words of a statute according to their plain and ordinary meaning. *State v. Spence,* 768 N.W.2d 104, 107 (Minn. 2009); *see also* Minn.Stat. § 645.08(1) (2012). Additionally, "we read a statute as a whole and give effect to all of its provisions." *In re Welfare of J.J.P.,* 831 N.W.2d at 264.

Minnesota Statutes § 260B.125 (2012) broadly sets forth the scope of a juvenile delinquency certification proceeding, including providing certain presumptions regarding certification and listing certain public safety factors the juvenile court must consider. *See* Minn.Stat. § 260B.125, subds. 3–4. Specifically, subdivision 3 provides that if certain criteria are met, it is presumed that the proceeding will be certified to district court for

action under the laws and court procedures controlling adult criminal violations. *Id.,* subd. 3. "[T]he burden is on the child to rebut this presumption by demonstrating by clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety." *Id.*

It is undisputed that the presumption in favor of certification is applicable to this proceeding. J.H. was 17 years old at the time the alleged offense was committed; the delinquency petition alleges that J.H. committed an offense that would result in a presumptive commitment to prison under the Sentencing Guidelines and applicable statutes; and the juvenile court determined that probable cause exists that J.H. committed the alleged offense. *See* Minn. Stat. § 260B.125, subd. 3 (listing the requirements for the presumption of adult certification to apply). Therefore, the burden was on J.H. to overcome the presumption by demonstrating by clear and convincing evidence that retaining the proceeding in juvenile court would serve public safety.

A juvenile court must consider the following factors when determining if public safety would be served by retaining the proceeding in juvenile court:

> (1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the Sentencing Guidelines, the use of a firearm, and the impact on any victim;
>
> (2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the Sentencing Guidelines;
>
> (3) the child's prior record of delinquency;

(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

Minn.Stat. § 260B.125, subd. 4. A juvenile court must "give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency than to the other factors listed." *Id.*

We first address the seriousness of the alleged offense and J.H.'s prior record of delinquency. The juvenile court found that the seriousness of the alleged offense weighs in favor of certification. The court's finding is amply supported in the record. J.H. was charged with first-degree criminal sexual conduct, conspiracy to commit first-degree criminal sexual conduct, kidnapping, and committing a crime for the benefit of a gang. All of these offenses are serious crimes. *Cf. State v. Gant,* 305 N.W.2d 790, 791 (Minn.1981) (stating that the crimes of unlawfully entering the victim's home at night and violently sexually assaulting the victim were "serious crimes"); *see also Coker v. Georgia,* 433 U.S. 584, 597–98, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (discussing the "highly reprehensible" nature of rape and stating that "[s]hort of homicide, it is the ultimate violation of self") (internal quotation marks omitted). The record demonstrates that the offenses were especially violent because G.K. was forcibly removed from a car by several men, thrown onto a mattress, held down by several men, and then raped by a gang member. Moreover, the rape had a significant impact on G.K.

Regarding the prior-record-of-delinquency factor, the juvenile court determined that J.H. has no prior record of delinquency, and that therefore the third factor favors EJJ designation. The State does not challenge this finding.

The court of appeals acknowledged the juvenile court gave "great weight to the seriousness of the alleged offense," but determined that the juvenile court abused its discretion because it "did not expressly weigh the [prior record of delinquency] factor any heavier than the other factors." *In re Welfare of J.H.,* 829 N.W.2d 607, 618 (Minn.App.2013). In doing so, the court of appeals interpreted Minn.Stat. § 260B.125, subd. 4, to require the juvenile court to *"expressly weigh* [the seriousness of the offense and the prior record of delinquency factors] separately from the remaining factors," and to *"specifically delineate"* how these factors impacted the juvenile court's certification determination. *In re Welfare of J.H.,* 829 N.W.2d at 618 (emphasis added). We disagree with this interpretation of the statute.

The text of section 260B.125, subdivision 4, does not support the statutory interpretation adopted by the court of appeals. To be sure, the juvenile court must give "greater weight" to the seriousness of the offense and the child's prior record of delinquency factors when considering whether public safety would be served by retaining the proceeding in juvenile court. Minn.Stat. § 260B.125, subd. 4. The statute, however, does not require the juvenile court to "expressly weigh" these two factors separately from the other public safety factors, or to "specifically delineate" the impact of both of these factors on its certification determination. Instead, a juvenile court is only required to give greater weight to those two factors than the other factors listed in the statute.

The juvenile delinquency statutes and rules, which contain different requirements

for a juvenile court's factual findings if the juvenile court upholds the presumption of adult certification or concludes the presumption has been rebutted, support our interpretation. *See In re Welfare of J.J.P.*, 831 N.W.2d at 266 (stating that a court cannot add words or meaning to a statute or rule that are purposely omitted or inadvertently overlooked). Specifically, when a juvenile court orders certification to adult court in a presumptive certification case, the court's written order must state findings of fact as to only "(a) the child's date of birth; (b) the date of the alleged offense; [and] (c) why the court upheld the presumption of certification." Minn. R. Juv. Delinq. P. 18.07, subd. 2(A)(3). In contrast, when the juvenile court orders EJJ designation in a presumptive certification case, the court must "include in its decision written findings of fact and conclusions of law as to why the retention of the proceeding in juvenile court serves public safety, with *specific reference to the factors listed in subdivision 4*." Minn.Stat. § 260B.125, subd. 8(b) (emphasis added); *see also* Minn. R. Juv. Delinq. P. 18.07, subd. 2(B)(1).

 When a juvenile court orders certification, it is not required to specifically address each of the six statutory factors in its written order. *See Vang v. State*, 788 N.W.2d 111, 116 (Minn.2010) (stating that "the juvenile court is not required to make specific findings on each factor"). But the juvenile court must identify "the statutory basis on which the court relied" and "demonstrate[ ] the court fully [analyzed] the matter and carefully considered its decision." *Id.* Because the juvenile court is not required to make an express finding regarding the seriousness of the alleged offense and the child's prior record

of delinquency, it is not required to "expressly weigh" these two factors. Indeed, to "specifically delineate" the weight given to these two factors would risk turning the factors into a mathematical formula, which we explicitly rejected in *In re Welfare of D.M.D.*, 607 N.W.2d 432, 438 (Minn.2000). Rather, juvenile courts "have the discretion to weigh the factors in the context they are presented." *Id.*

We conclude that section 260B.125, subdivision 4, does not require the juvenile court to either expressly weigh the seriousness of the offense and the prior record of delinquency separately from the other public safety factors, or specifically delineate how these two factors impacted its certification determination.[2] The juvenile court is required, however, to give greater weight to those two factors than the other factors listed in the statute. The juvenile court must also identify the statutory basis upon which it relied, and demonstrate that it carefully considered its decision.

 Here, the juvenile court's order explicitly states that it gave greater weight to the seriousness of the alleged offense and J.H.'s prior record of delinquency than to the other four public safety factors. The order also demonstrates that the court relied on the presumption in favor of certification in Minn.Stat. § 260B.125, subd. 3, and that the court thoroughly considered whether J.H. rebutted the presumption in favor of certification. Consequently, the juvenile court satisfied the requirements of the statute.

 Turning to the remaining public safety factors, J.H. argues that the culpability-of-the-child factor favors EJJ designation. *See* Minn.Stat. § 260B.125, subd. 4(2). Specifically, J.H. argues that

---

**2.** To facilitate appellate review, the juvenile court may elect to explain in detail how these two factors impacted its decision of whether a

child has rebutted the presumption in favor of certification for prosecution as an adult.

he played a passive role in the offenses because he did not drag G.K. from the car, hold her down, or sexually assault her. For purposes of a certification determination, the charges against the child and the factual allegations of the petition are presumed true. *In re Welfare of N.J.S.*, 753 N.W.2d 704, 708 (Minn.2008). To determine whether a child is culpable, we examine the alleged offenses. J.H. was charged as a principal and accomplice for first-degree criminal sexual conduct, conspiracy to commit first-degree criminal sexual conduct, kidnapping, and committing a crime for the benefit of a gang. To prove J.H.'s criminal liability as an aider and abettor, the State must prove that J.H. knew that his accomplices were going to commit a crime and that he intended his presence or actions to further the commission of that crime. *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn.2007); *see also State v. Milton*, 821 N.W.2d 789, 806 (Minn.2012). But "active participation in the overt act which constitutes the substantive offense is not required." *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn.1995).

▮ The juvenile court found that the culpability of J.H. weighed in favor of certification. The juvenile court concluded that J.H.'s actions "were part of a horrific concerted effort to rape" G.K., and he was therefore "equally culpable" as the individuals who held G.K. down and raped her. The evidence in the record is sufficient to support the finding of the juvenile court. There is evidence that J.H. and the other gang members planned to get G.K. drunk and then take turns raping her. The gang members, including J.H., executed the plan, and J.H.'s presence in the bedroom during the rape, coupled with his failure to object to the rape, may be viewed as evidence of his support of what occurred. *See State v. Hawes*, 801 N.W.2d 659, 668 (Minn.2011) (stating that a jury may infer

a defendant intended his actions to aid the commission of a crime by, among other things, his presence at the crime scene and lack of objection to the crime). At this stage of the proceeding, the juvenile court's finding that J.H. is culpable as an aider and abettor based on the facts alleged in the delinquency petition was not clearly erroneous.

Turning to the fourth public safety factor, the parties dispute the meaning of "the child's programming history." Minn. Stat. § 260B.125, subd. 4(4). J.H. argues that "programming history" refers to formal programming, such as programming within the juvenile justice system. The State counters that evidence of a child's behavior in informal settings, such as at home or at school, is relevant in determining whether the child is amenable to treatment.

Generally, the child's "programming" refers to a specialized system of services, opportunities, or projects designed to meet a relevant behavioral or social need of the child. Minn.Stat. § 260B.125, subd. 4(4); *see The American Heritage Dictionary of the English Language* 1407 (5th ed.2011) (defining the word "program" to mean "[a] system of services, opportunities, or projects, usually designed to meet a social need"). Unlike the fifth public safety factor, which also uses the term "programming," this factor is not associated with the phrase "juvenile justice system." *See* Minn.Stat. § 260B.125, subd. 4(5) (listing the fifth public safety factor as "the adequacy of the punishment or *programming available in the juvenile justice system*" (emphasis added)). Recently, we concluded that the juvenile court did not err when it found that the child's "programming history" factor favored certification because the child had failed to successfully complete a voluntary residential program by engaging in defiant and uncooperative be-

havior toward program staff. *In re Welfare of N.J.S.*, 753 N.W.2d at 707, 711.

▮ Consequently, we conclude that a child's programming history in subdivision 4(4) is not limited to formal programming history in the juvenile justice system; instead, it broadly refers to programming history consisting of a specialized system of services, opportunities, or projects designed to meet a relevant behavioral or social need of the child. Generally, a school does not fall within the broad definition of programming in subdivision 4(4) because its purpose is to provide children with basic education, not to address specific behavioral or social issues of a child relevant to juvenile delinquency. Moreover, parenting does not meet the definition of programming in subdivision 4(4). It is true that parents are usually the best teachers of their children and the most equipped to address their children's behavioral and social needs. Subdivision 4(4), however, is directed at a specialized system of services, opportunities, or projects designed to meet the relevant behavioral or social needs of the child. Thus, a specialized program provided either through the juvenile justice system, or through a non-juvenile justice system setting, that is designed to address a relevant behavioral or social need of the child may be considered by the court in assessing a child's programming history in subdivision 4(4).

▮ The juvenile court's finding that J.H.'s programming history favored certification is not supported by the record. Specifically, J.H.'s failure to attend a school that provides basic education, and his failure to follow his father's rules do not establish a lack of willingness to participate in a system of services, opportunities, or projects designed to address a relevant behavioral or social need of J.H. We therefore conclude that this factor does not weigh in favor of adult certification.

▮ With respect to the fifth factor, the juvenile court found that the adequacy of the punishment or programming available in the juvenile justice system favored certification. *See* Minn.Stat. § 260B.125, subd. 4(5). The court found that 42 months of EJJ supervision would not sufficiently address the seriousness of the offense or ensure public safety. The court of appeals, however, credited the testimony of Moua and Dr. Hertog and found that this factor favored EJJ designation. *In re Welfare of J.H.*, 829 N.W.2d at 615–16. On matters of credibility and the weight to be given the testimony of witnesses, we defer to the juvenile court. *See DeMars v. State*, 352 N.W.2d 13, 16 (Minn.1984); *see also Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn.1988) (stating that "[d]eference must be given to the opportunity of the trial court to assess the credibility of the witnesses"). Here, Moua admitted, assuming the allegations are true, that J.H. was an untreated sex offender and was a long-standing member of a violent street gang, and Moua did not know whether the available programming could address J.H.'s needs. Dr. Hertog admitted that J.H. may not embrace treatment or change while in the juvenile system. The juvenile court's finding is supported by the record and not clearly erroneous.

Under the sixth factor, the two dispositional options available to J.H. were certification to stand trial as an adult or EJJ designation. *See* Minn.Stat. § 260B.125, subd. 4(6). The juvenile court concluded EJJ was not an appropriate dispositional option in this case because of J.H.'s long-term gang involvement and the nature of the gang's criminal activities. The court noted that if J.H. were designated for EJJ prosecution, he would be "placed in programming, returned to the community

within the next year or two, and supervised to age 21." But if J.H. were certified to adult court and convicted, he faces a term of incarceration anywhere from 204 months to 336 months, followed by intensive supervised release with strict conditions including not associating with gang members for an extended period of time.

 The court of appeals relied upon the expert testimony of Moua to conclude that the juvenile court's finding that this factor favors certification is clearly erroneous. But Moua and Dr. Hertog admitted that J.H.'s gang involvement is an obstacle to his successful EJJ participation. And, as with the previous factor, we defer to the juvenile court's determination on the credibility and weight to be given witnesses' testimony. *See DeMars,* 352 N.W.2d at 16. We therefore conclude there is ample evidentiary support in the record for the juvenile court's conclusion that this factor favors certification.

 We conclude that the juvenile court did not abuse its discretion when it determined that J.H. had not rebutted the presumption in favor of certification by demonstrating by clear and convincing evidence that public safety would be served by retaining the proceeding in juvenile court. The juvenile court analyzed all six of the statutory public safety factors, made written findings regarding each factor even though it was not required to do so, and expressly stated that it gave greater weight to the seriousness of the offense and J.H.'s prior record of delinquency in making its decision. Because the district court's findings on four of the public safety

factors, including the seriousness of the offense, are not clearly erroneous and favor certification, the juvenile court did not abuse its discretion when it certified J.H. for adult prosecution.[3]

Reversed.

---

**3.** J.H. also argues in his brief that the certification statute is unconstitutional. This issue was not raised before the juvenile court, nor was it raised by either the State or J.H. in the petition for review or response to the petition for review. Therefore, we conclude that the issue is not before us, and we decline to

address it. *See* Minn. R. Civ.App. P. 117, subds. 3–4; *see also State v. Bell,* 719 N.W.2d 635, 639 (Minn.2006) (concluding that an issue not raised by the defendant below or in his petition for review was waived and not properly before the court).